Chief Judge Conway
(dissenting). This is an action for medical malpractice. The plaintiff, Nathan Baidach, instituted suit against Charles Togut, doing business as Linden General Hospital; Henry Bloomberg, a surgeon; and a number of other defendants against whom the action was later abandoned. It appears that plaintiff, while a patient in Togut’s hospital, sustained injuries following a prostatectomy performed by Dr. Bloomberg, a urology specialist. It further appears that the injuries resulted from a transfusion which contained a drug called “levophed.” Such drug is destructive of certain body tissue when brought into direct contact with it. Patient Baidach was receiving the drug intravenously when, sometime on the morning of September 5, 1956, it infiltrated the tissues of his right arm and hand, either because the needle was not properly placed or because, although properly inserted initially, it was not kept in a proper position.
After trial, plaintiff recovered a verdict of $22,500 against Togut and Dr. Bloomberg and a joint judgment was entered thereon. The Appellate Division reversed ‘ ‘ upon the law ’ ’ and dismissed the complaint as to Dr. Bloomberg. As to Togut, the Appellate Division reversed and ordered a new trial unless plaintiff agreed to stipulate to accept a reduction of *133 damages to $17,500, which the plaintiff did. Thereafter, Togut paid the full sum of $17,500 and abandoned his appeal to this court as against plaintiff by failing to argue that the Appellate Division erred insofar as it authorized plaintiff’s recovery against him. In effect, Togut has conceded his liability to the plaintiff. His only interest now is in receiving contribution from Dr. Bloomberg by reason of which he has appealed to us from so much of the Appellate Division determination as dismissed the complaint as against the doctor. The plaintiff, having received payment from Togut of the judgment in the amount of $17,500, which judgment was entered pursuant to the stipulated reduction of damages, has taken no appeal from the dismissal of his complaint against Dr. Bloomberg.
This appeal presents two questions, one procedural and one substantive. The procedural question, which must be treated first, is whether Togut, who complains only of the fact that his codefendant was released from liability by the Appellate Division, is a party aggrieved for purposes of appeal to this court. Obviously he has such status only if the determination of the Appellate Division adversely affected his right of contribution from Dr. Bloomberg.
Section 211-a of the Civil Practice Act provides, in, part, that “ Where a money judgment has been recovered jointly against two or more defendants in an action for a personal injury or for property damage, and such judgment has been paid in part or in full by one or more of such defendants, each defendant who has paid more than his own pro rata share shall be entitled to contribution from the other defendants with respect to the excess so paid over and above the pro rata share of the defendant or defendants making such payment; * * Thus, the Legislature has prescribed two conditions precedent to contribution between or among joint tort-feasors: (1) that a money judgment be recovered jointly against them and (2) that one (or more) of them has paid more than his prorata share of such judgment.
It is undisputed that had Togut paid the judgment recovered against Dr. Bloomberg and himself prior to the Appellate Division decision he would be a party aggrieved for purposes of appeal to our court. Under that set of facts, he would clearly have met both the conditions precedent to contribution contained *134 in section 211-a. However that may be, defendant Bloomberg argues that Togut is not entitled to contribution, hence, is not a party aggrieved, because the judgment satisfied by Togut was not a “ joint ” judgment, but rather the judgment authorized by the Appellate Division — a judgment against Togut only. Phrased differently, Dr. Bloomberg recognizes that the first condition of section 211-a was met here, namely, that plaintiff recover a money judgment jointly against two or more defendants. His contention, in effect, is that the second condition has not been satisfied, namely, that one or more of the defendants pay more than his prorata share of “such judgment”. Dr. Bloomberg would have us hold that the phrase “such judgment ” must be construed to require a joint tort-feasor to make his payment before an appeal is taken to the Appellate Division if he is to protect himself against a reversal in that court as against another tort-feasor. We fail to perceive the logic in such a construction. Section 211-a was designed to adjust the rights as among joint tort-feasors after the plaintiff has been given his due. Plaintiff here has had his due. There has been a joint judgment against defendants and plaintiff has received full payment and damages for his injuries. If the Appellate Division erred in disturbing the judgment recovered in the trial court, the truly final judgment in the action, when we have corrected the error and if Dr. Bloomberg is ultimately held to have been at fault, there will be the same joint judgment of the same trial court — superseding that entered on the Appellate Division order and itself being deemed the judgment that Togut really satisfied.
The case of Ward v. Iroquois Gas Corp. (258 N. Y. 124), relied upon by Dr. Bloomberg, does not announce a contrary rule. In that case the appealing defendant did not make any payment to the plaintiff and, as we have demonstrated, payment is a condition precedent to contribution.
One other case bears mention on the procedural problem here involved — Epstein v. National Transp. Co. (287 N. Y. 456). There plaintiffs had judgment against several defendants. One of them paid the judgment in full and obtained a default judgment against another for the latter’s contributive share. But the nonpaying defendant had appealed to the Appellate Division in the hope of avoiding liability entirely. The paying defendant *135 moved before that court to be substituted as respondent (the plaintiff having no further interest in the action). The Appellate Division denied the motion, but we reversed and ordered the motion granted, answering in the affirmative the Appellate Division’s certified question as to whether the paying defendant was “ an interested party under section 557 of the Civil Practice Act ”. If we could find that the paying defendant in the Epstein case was sufficiently “ interested ” to entitle him to be substituted as respondent for plaintiff, a fortiori we must uphold Togut’s status here. The reason is obvious. In the Epstein case the Appellate Division had not reversed as to the nonpaying defendant. If the paying defendant was nonetheless sufficiently interested to oppose an appeal against a codefendant who was not yet let out of liability, Togut here is that much more interested or aggrieved by an order which does purport to dissolve his potential contributor’s liability. “ Aggrieved ” is the key word in the taking of an appeal (Civ. Prac. Act, § 557), and it defines Togut more accurately than it defined the paying defendant in the Epstein case.
Inasmuch as we are persuaded that Togut is a party aggrieved, we turn to the substantive question in the case, namely, whether Dr. Bloomberg was guilty of malpractice.
The Appellate Division divided 3 to 2 on that issue. The majority held that “ There was no proof of malpractice or of negligence on his [the doctor’s] part. He had the right to rely upon the competency of the hospital staff, particularly that of the resident physician, to insert the needle properly and to check frequently the intravenous flow after the levophed had been added.”
That statement would apply if the doctor had relied on the ■ resident physician; or if, relying upon other hospital personnel, he had made them cognizant of dangers they could not be expected to appreciate. The evidence, including Dr. Bloom-berg’s own admissions, however, shows that he did not rely upon the resident physician and did not utter a syllable of warning to the practical nurse with whom he spoke by telephone. Nor did he tell the practical nurse (a Mrs. Levine) to have the resident physician administer the levophed or supervise its administration.
*136 Dr. Bloomberg’s own testimony is that he did not caution against levophed’s possible effects, although he admitted knowing that “ It may affect various tissues if it leaks ”; that “ it may cause some necrosis of the tissue ’ ’; and he defined “necrosis” as “destruction of tissue.” Under questioning by the court, he admitted specifically that he knew he was talking “ to a nurse and not a doctor ”. ■
In the event that a drug known to a surgeon to have a destructive potential is to be administered to his patient, the law must be said to impose at least minimum safeguards, and among them is at least a competent instruction or admonition to those upon whom such surgeon chooses to rely.
If Dr. Bloomberg- chose to rely upon the professional abilities of the resident physician, it would have taken only a sentence over the telephone to assure that the latter administered the drug. He had not even to speak directly with the resident; it would have sufficed simply to tell practical nurse Levine to see that the resident administered the drug or supervised its dispensation. He could have done even less than that, consistent with due care. He could simply have told the nurse of the drug’s dangerous potential and instructed her to' make sure that the needle was watched carefully throughout the intravenous operation. The nurse could have done that herself or communicated the instruction to the other practical nurse (one John 0. Fleming) who was in attendance at the patient’s side. It was Mr. Fleming- who administered the levophed, and he was the only one in attendance at that time. Neither the resident physician nor any other doctor or nurse came into the patient’s room after the levophed was started and before Fleming was relieved.
Those facts in themselves establish what seems to us a question ( for a jury. In Volume 41 of American Jurisprudence (Physicians and Surgeons, § 99, p. 215) it is said that: “If the surroundings are those of the modern hospital, with experienced nurses and attendants, the doctor ought to be entitled to take for granted that they will attend to their ordinary customary duties without instruction, although even in such surroundings it is clearly his duty to give instructions which are essential to the safety and well-being of the patient, where there are unusual features in the case or its treatment.”
*137 The destructive potential of a drug like levophed constitutes what must be deemed an “unusual feature”, especially since it is a relatively new drug requiring greater care in administration than other fluids — which facts could not be presumed to be within the knowledge of practical nurses. Even then, we need not say that Dr. Bloomberg could not rely on hospital personnel; but by any criterion the facts warranted at least the verbal admonition that the drug had harmful potential and the needle must be given extra-special attention. Were levophed not there, the needle’s movement would have offered no injury.
The absence of any manner of admonitory instruction seems in itself a ground of malpractice sufficient to submit to a jury. But it is by no means the only matter going to the doctor’s malpractice.
Dr. Meyer Kaplan, a specialist in general surgery and the doctor who referred plaintiff to Dr. Bloomberg, himself testified that it was the custom and practice in New York City in 1956 that a physician be present at the time that levophed is administered. His exact words are: “ My answer is yes, it should be done by a physician only.”
He further testified that the “ skill of a doctor ” is necessary in administering levophed in order ‘ ‘ to adjust the flow of levophed in accordance with the blood pressure ”. As to whether or not reliance should be placed on the house physician when the patient’s condition has become such that levophed is needed (and we repeat here the fact that Dr. Bloomberg did not contact the resident or leave instructions with or for him), Dr. Kaplan testified that in such case: “I would discuss the case quickly with the house surgeon. If the patient’s condition was such as demanded more experienced attention than the house surgeon could give him, I would go myself, or send an associate with sufficient experience whose opinion I could trust.” (Emphasis supplied.)
Dr. Bloomberg left no word at all to summon the house physician to plaintiff’s side, much less make inquiry as to his qualifications or experience in a case like this. In fact, the resident (a Dr. Margolies), had been a doctor for only two years at the time. At 5:00 p.m. on the day of the operation Dr. Margolies noted that the patient’s condition was critical; that he was hemorrhaging; and that at 11:00 p.m. his condition was “ poor.” *138 He tried several times to contact Dr. Bloomberg, who of course remained in charge of the case; Dr. Bloomberg had performed the operation on that day (September 4,1956) between 11:00 a.m. and 1:00 p.m. The first effort by Dr. Margolies to locate Dr. Bloomberg was at about 5:00 p.m. ; he could not get him. He left a message at Dr. Bloomberg’s office. At this juncture we might note that Dr. Bloomberg — the doctor who performed the operation and retained control of the case — did not even leave word as to how he could be contacted if an emergency arose. And plaintiff, on the evening in question, was the most critically ill patient in the hospital. It was not until after 11:00 p.m. that Dr. Bloomberg was contacted personally; it was nurse Levine who reached him. She told him ‘1 that his patient apparently was in a state of post-operative shock and appeared very weak ’ ’. Dr. Bloomberg still did not go to the hospital, although by his own testimony he admitted that he was at home when he received the call; that his home was but 10 minutes from the hospital; and that he did not have “ anything medically ” that he was working on at that moment. As noted, he made no inquiry as to who would be administering the levophed he ordered. He did not prescribe the rate at which the drug should be given.
To add to the foregoing testimony, there was that of a Dr. Murray E. Burton, a specialist in orthopedic surgery and a fellow of the American Academy of Orthopedic Surgeons. He testified that, under the circumstances of the hypothetical question put to him to approximate the situation surrounding the plaintiff, the ordering of levophed by telephone was neither customary nor usual in New York City in 1956. The doctor “ should have gone down to the hospital ”, he said.
We regard it as error for the Appellate Division, in view of the vast evidence of malpractice offered, to have held that as matter of law no malpractice was proved against Dr. Bloomberg.
The judgment of the Appellate Division should be reversed and the case remitted to that court for determination of the questions of fact, without costs to either party.
Judges Dye, Fuld, Van Voorhis and Bueke concur with Judge Desmond; Chief Judge Conway dissents and votes to reverse in an opinion in which Judge Froessel concurs.
Appeal dismissed.